# UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Case No. 1:23-cr-657 |
| | ) | |
| TROY LUCKETT, | ) | Judge Valderrama |
| | ) | |
| Defendant. | ) | |

## DEFENDANT TROY LUCKETT'S RESPONSE TO PSR AND POSITION REGARDING SENTENCING

Defendant, Troy Luckett ("Mr. Luckett"), by and through his undersigned counsel, submits the following Response to the PSR and Position Regarding Sentencing:

### I. OBJECTIONS TO THE PSR

Mr. Luckett does not have any substantive objections to the PSR.

### II. PROCEDURAL BACKGROUND

In February 2024, the Government filed a two count Indictment that charged Mr. Luckett with one count of bank robbery, as well as one count of brandishing in violation of 18 U.S.C. § 924(c)(1)(A)(ii). On April 1, 2025, Mr. Luckett pled guilty to those counts, pursuant to a written plea agreement. *See* Dkt., at 122-24.

In the PSR, US Probation has recommended a sentence that is *below* the Guidelines. *See* Sentencing Recommendation, at p. 3. That suggested sentence is a total of 151 months, which includes 67 months on the bank robbery count, and 84 months on the mandatory brandishing count.

As discussed below, while that suggested below Guidelines sentence is absolutely appropriate, it is *still greater than necessary* to achieve the legitimate aims of sentencing - particularly in light of the consecutive mandatory minimum sentence of seven years on Count 2.

## PERSONAL BACKGROUND

### *Mr. Luckett's Personal Background*

Mr. Luckett is a lifelong resident of the Chicago area. He attended high school in the suburbs. *See* PSR, at p. 17, para. 68.

Mr. Luckett had a challenging life as young man. As noted in the PSR, one of the pivotal issues in his development was the loss of his father at a young age (fifth grade). *See* PSR at p. 15, para. 60. Mr. Luckett's mother was unable to afford counseling for him at that time. *Id.* at p. 16, para. 64. Whether because of the loss of his father or other reasons, Mr. Luckett has suffered from essentially untreated anxiety since he was a young child. *Id.* at p. 19, para. It is unfortunate that condition went untreated in light of the fact that Mr. Luckett's family was focused on his brother's serious medical issues. *Id.* at p. 19, para. 81.

Equally significant, as noted by the PSR, Mr. Luckett lacked any consistent male role model in his life. *Id.* As a result, after the death of his father, Mr. Luckett's life veered into substance abuse, and "negative peers." *Id.* at p. 16, para. 65.

Despite those obstacles, Mr. Luckett has maintained a deep love for his family. That love, and Mr. Luckett's character, is shown by the fact that he agreed to undergo surgery to provide bone marrow for his brother. *Id.* at p. 16, para. 62.

In addition, by all accounts, Mr. Luckett has been a consistently loving and caring father to his young son, Mylo.

Mr. Luckett's penchant for looking out for and responding to the needs of others is illustrated by the letters of support submitted on his behalf. *See* Dkt. No. 130. For example, Jeremiah Townsend, who has known Mr. Luckett for approximately a decade, attests to the fact that Mr. Luckett was always there for him – including assisting Mr. Townsend with his college search and visits.

Similarly, Mr. Luckett's brother, Noah - for whom Mr. Luckett sacrificed by undergoing the above-referenced bone marrow operation - attests to the fact that Mr. Luckett always "brings good energy," and is consistently "uplifting" to all those around him. *Id.*

### III. DEFENDANT'S VERSION OF THE OFFENSE

The facts are adequately set forth in the PSR and in the Government's Version of the Offense.

Mr. Luckett has fully accepted responsibility for his actions and offense conduct, and continues to do so. During his allocution, Mr. Luckett will make that plain and clear to this Court - in addition to expressing his sincere remorse for his actions, including to the victims.

### IV. DEFENDANT'S POSITION REGARDING SENTENCING

This Court exercises broad discretion to determine a just and equitable sentence that punishes the individual offender, as opposed to just the crime. *See, e.g., United States v. Ramirez-Mendoza*, 683 F.3d 771, 777 (7th Cir. 2012). After first calculating the applicable advisory Guidelines range, this Court is then tasked with imposing a sentence that is reasonable under 18 U.S.C. § 3553(a), and importantly *not greater than necessary*. However, because Guidelines ranges are <u>not</u> to be presumed reasonable, this Court must also consider whether they actually conform to the particular circumstances of this individual case, and this particular defendant – here, Mr. Luckett. *Nelson v. United States*, 555 U.S. 350 (2009); *United States v. Cunningham*, 429 F.3d 673, 676 (7th Cir. 2005); *United States v. Dean*, 414 F.3d 725, 730-31 (7th Cir. 2005). So long as the selected sentence is "rooted in § 3553(a), sufficiently individualized to the circumstances of the case, and generally associated with sentencing leniency," a *below* Guidelines sentence is entirely appropriate. *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007). In fact, this Court is entitled to disagree with the result of the Guidelines calculation, and even categorically reject the Sentencing Commission's policy

choices. *Spears v. United States,* 555 U.S. 261 (2009)*; United States v. Aguilar-Huerta,* 576 F.3d 365, 466-67 (7th Cir.).

Here, as set forth below, Mr. Luckett respectfully asks this Court to use its discretion, in accordance with the § 3553(a) factors, to impose a total sentence of 120 months (**TEN YEARS**) which would include 36 months on the bank robbery count, and of course the seven years (mandatory minimum) on the brandishing count.

V. **APPLICATION OF 18 U.S.C. §3553(A) FACTORS**

**THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT**

Mr. Luckett deeply understands the seriousness of the offense, and fully accepts responsibility for his transgressions. Moreover, Mr. Luckett and his counsel well recognize the persistent and seemingly intractable problem of gun possession in Chicago (and nationally). Nonetheless, this Court should still consider, in mitigation and under 3353, Mr. Luckett's personal history and characteristics.

**THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT OF THE LAW, TO PROVIDE JUST PUNISHMENT AND ADEQUATE DETERRENCE**

This Court must determine what constitutes a "just" punishment for Mr. Luckett. While the Guidelines serve as a very rough benchmark, they fail to adequately account for the unique characteristics of Mr. Luckett, including the loss of his father; his caring and giving spirit; the young age at which he committed the offenses that unduly cause a catastrophic increase in his Criminal History category; and the nature of that conduct - i.e., relatively minor offenses - that unduly cause a catastrophic increase in his Criminal History category.

Here, even the below Guidelines range sentence suggested by the PSR would be unnecessarily high, and "*greater than necessary*" to fulfill any of legitimate aims of sentencing.

Undoubtedly, the offense conduct in the instant case was serious. However, one is hard-

pressed to credibly argue that a total sentence of **ten years**, including the consecutive 7-year mandatory minimum on the brandishing count, would *not* adequately reflect the "seriousness of the offense." By anyone's measure, that would still be quite a significant sentence. Such a sentence would adequately reflect the "seriousness of this offense, *more than* "promotes respect for the law;" and represents a "just punishment" for the actual offense conduct.

Moreover, there is simply no empirical basis whatsoever for this Court finding that any month (or day) above and beyond **ten years** would serve to *better* achieve any of the legitimate goals of sentencing.

With respect to general deterrence, it is simply far-fetched and not empirically supported that anyone will take heed of the sentence imposed upon Mr. Luckett and conform their actions to account for such a sentence. This is particularly the case where, as here, this is certainly *not* the type of case that has, or ever will, generate any media or other public attention.

Furthermore, a core finding of research reveals that deterrence is primarily a function of the *certainty* of punishment, not its *severity*. *See* Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime and Just. 199, 207 (2013). Daniel Nagin, one of the foremost scholars of deterrence in the United States, has found that "the effect of certainty rather than severity of punishment reflect[s] a response to the certainty of apprehension." It is the certainty of punishment, the likelihood of getting caught, prosecuted, and punished, that will deter the general public, not the severity of prison time. Mr. Luckett's conduct in this case has already resulted in certain punishment, a federal felony conviction, which will affect him for the rest of his life.

Deterrence research also demonstrates that longer terms of imprisonment yield diminishing returns for public safety as individuals "age out" of high-crime years. Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, 87:1 UMKC Law Review

113, 121 (2018).

In addition, as the Court is aware, a federal conviction is a stigma that blights one's life forever and has and will continue to have severe consequences on not just Mr. Luckett, but also his family. Such punishment provides a permanent reminder of his wrongdoing, and for Mr. Luckett carries a high degree of guilt and shame.

## MR. LUCKETT'S CRIMINAL HISTORY IS SUBSTANTIALLY OVERSTATED

Here, there can be no doubt that Mr. Luckett's Criminal History category is substantially overstated. Indeed, based upon the fact that Mr. Luckett engaged in criminal conduct at a young age, and relatively minor conduct at that, his Criminal History – and in turn, his Guidelines range – is obviously grossly inflated, or as the courts have stated, "substantially overstated." *See, e.g., United States v. Ocampo*, 2007 WL 1849427 (7th Cir. 2007).

Accordingly, this Court should strongly consider that factor in mitigation in fashion an appropriate sentence for Mr. Luckett, including one that is *not* greater than necessary to fulfill the legitimate aims of sentencing.

## THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

Section 3553(a)(6) requires the Court to consider "*the need to avoid unwarranted sentencing disparities among defendants with similar records that have been found guilty of similar conduct.*" 18 U.S.C. 3553(a)(6).

Here, there is no justification for Mr. Luckett's co-Defendant, Kendall Sullivan, to be facing a dramatically lower sentence than Mr. Luckett. Indeed, it is undisputed that Mr. Sullivan was the leader and organizer of the bank robbery.

Therefore, particularly in light of Mr. Luckett's grossly inflated Criminal History category, there is no legitimate justification for the fact that Mr. Sullivan faces - and will likely

receive - a far lesser sentence than Mr. Luckett.

**A TEN-YEAR SENTENCE IS FULLY CONSISTENT WITH THE TREND OF COURTS IN RECOGNIZING THAT YOUNGER OFFENDERS, LIKE MR. LUCKETT, ARE LESS CULPABLE BASED UPON THE COMPELLING SCIENTIFIC RESEARCH REGARDING BRAIN DEVELOPMENT**

The central issues in the present case with respect to the application of the Guidelines are: the young age at which Mr. Luckett committed much of the conduct that forms the basis for his overly inflated Criminal History, as well as the relatively young age at which he committed the instant offense.

Recently, courts, including the United States Supreme Court, have explicitly recognized that younger offenders like Mr. Luckett can, and often must, be treated as less culpable - including for purposes of sentencing - based upon the scientific research regarding adolescent brain development. *See, e.g., Graham v. Florida*, 560 U.S. 48 (2010). In *Graham*, the United States Supreme Court noted that "**developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence**." *See Graham*, 560 U.S. at 568 (emphasis added) (*citing* Brief for American Medical Association, *et al.*, 16–24; Brief for American Psychological Association, *et al.*, 22–27).

Moreover, one such recent decision, *United States v. Ramsay*, 538 F.Supp.3d 407 (S.D.N.Y. 2021), provides an excellent summary and "state of the law" with respect to the application of these concepts. As the court in *Ramsay* first noted, "**Youth Matters in Sentencing**." *Id.* (emphasis in original). The *Ramsay* court went to explain that, "[i]n several cases since the 1980s, the Supreme Court has held, based on "the evolving standards of decency that mark the progress of a maturing [S]ociety . . . that 'youth matters in sentencing.'" *Id.* at 415 (*citing Roper v. Simmons*, 543 U.S. 551, 561 (2005), *Trop v. Dulles*, 356 U.S. 86, 100-101

(1958), and *Jones v. Mississippi*, 141 S.Ct. 1307, 1315 (2021)).

The *Ramsay* court first noted that, in *Thompson v. Oklahoma*, 487 U.S. 815 (1988), the Supreme Court, among other things, "engaged in its own analysis of the differences between adolescent and adults and concluded that 'less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult.'" *Ramsay*, 538 F.Supp.3d at 415 (*quoting Thompson*, 487 U.S. at 835).

The *Ramsay* court then explained that, in *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court subsequently "adopted and expanded the view" regarding the difference between youthful and adult defendants by relying "largely on everyday experience to inform its judgments regarding the adolescent brain." *Id.* The *Ramsay* court further noted that, in *Roper* - in the context of examining the death penalty as applied to youthful offenders - the Supreme Court "again relied on everyday experience, **but it also cited recent developments in the psychological and sociological literature that helped explain adolescent impulsivity and the like**." *Id.* (emphasis added).

The *Ramsay* court further explained that, in *Graham v. Florida*, 560 U.S. 48 (2010), the Supreme Court - in the context of considering life sentences for youthful offenders without the possibility of parole - relied on "developments in psychology and brain science [that] continue to show fundamental differences between juvenile and adult minds. For example, **parts of the brain involved in behavior control continue to mature through late adolescence**." *Id.* (emphasis added) (*citing Graham*, 560 U.S. at 68).

Furthermore, the *Ramsay* court, in reviewing the appropriateness of the sentence imposed in the case before it (which was committed by youthful offender), stated that, "this Court, like the Supreme Court, looks not only to the general impressions provided by everyday experience ("common sense") but also to the more refined and tested evidence concerning development of

the adolescent brain provided by recent research and studies in neuroscience, psychology, and sociology." *Ramsay*, 538 F.Supp.3d at 417.

The *Ramsay* court held that "the developments in neuroscience, psychology, and sociology . . . have sufficient rigor as to render them useful in determining how adolescence should impact sentencing in general." *Id.* In granting a sentence reduction, the *Ramsay* court relied upon the fact that, *inter alia*:

> . . . the prevailing neuroscientific explanation for adolescents' immaturity begins with the fact that [t]he frontal lobes, home to key components of the neural circuitry underlying executive functions such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life. Children's brains have a proliferation of neural connections (dendritic overproduction). Then, beginning around age 11 to 12, rarely used connections are selectively pruned[,] making the brain more efficient. This increase in efficiency progresses from the back to the front of the brain; [e]vidence suggests that, in the prefrontal cortex, the area responsible for executive functions, the process is not complete **until the early 20s or later**. . . . When sentencing adolescent offenders . . . courts should bear in mind the adolescent maturity gap.

*Ramsay*, 538 F.Supp.3d at 417-418 (emphasis added)

The *Ramsay* court further relied upon the Supreme Court's identification of another "broad difference [between juveniles and adults] is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. This struggle to define their identity decreases the likelihood that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." *Id.* at 422 (*citing Roper*, *supra*, 543 U.S. at 570). The *Ramsay* court additionally found that "[r]espected social science studies support this conclusion." *Id.* at 422. For these reasons, the *Ramsay* court stated that, when sentencing adolescent offenders, judges should consider the chance that their youthful "character deficiencies will be reformed." *Id.*

To be clear, the court's analysis in *Ramsay* is **not** an aberration; it is illustrative of the

trend by federal courts across the country to take into account the accepted science that youthful offenders have markedly different brain development, and thus are found to be less culpable for purposes of determining the duration of a defendant's sentence. *See, e.g., United States v. Rosario*, No. 99-CR-533, 2018 WL 3785095, at *1-2 (E.D.N.Y., Aug. 9, 2018) (reducing defendant's sentence based upon the Supreme Court cases cited in *Ramsay*, which "[C]ollectively . . . **stand for the proposition that adolescents are different from adults—and must be treated differently by courts . . . based not only on society's evolving standard of decency,' but also on our increasing understanding of adolescent brain development**") (emphasis added);[1] *United States v. Lebaron*, No. H-92-177-05, 2023 WL 7308116 (S.D. Texas, Sept. 6, 2023) (in ordering a reduced sentence, the court relied upon the United States Supreme Court's recognition that "youthful offenders are less deserving of harsh punishment because, in comparison to adults, juveniles have a lack of maturity and an underdeveloped sense of responsibility, and "**the advances in scientific research on the development of the adolescent brain**") (citations omitted and emphasis added); *United States v. Faulkner*, No. 01-457-7, 2023WL 1971192 at *4 (E.D. Pa., Feb. 13, 2023) (recognizing and relying on the "**compelling scientific research regarding adolescent brain development which indicates that the area of**

---

[1] The court in *Rosario* (2018 WL 3785095, at *1) (emphasis added) further explained:

> . . . recent research has established that the areas of the human brain dealing with judgment and decision-making continue to mature **well into our 20s**. Thus, due to neurobiological immaturity, even older adolescents continue to demonstrate difficulties in exercising self-restraint, controlling impulses, considering future consequences, and making decisions independently from their peers' . . . These findings, taken together, are of significance in assessing all four of the classic penological justifications of punishment. As Miller states, retribution, deterrence, incapacitation, and rehabilitation typically will not justify the harshest sentences for juveniles who commit crimes, even for those who commit truly heinous crimes. In the words of the Miller court, quoting *Graham*: because [t]he heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult.

**the brain that governs reasoning and impulse control continues to mature into a person's early to mid-twenties**," in granting the defendant a reduction in his sentence) (emphasis added); *Harmon v. Secretary, Florida Dept. Corrs.*, No. 3:19-cv-1080-MMH-LLL, 2022 WL 4305920, at *11 (M.D. Fla., Sept. 19, 2022) ("this Court is aware of the science and has fully and thoughtfully considered the science on adolescent brain development in deciding an appropriate and constitutional sentence . . . Adolescent brain science sheds light on some of the underlying causes of poor judgment and impulsive decision making in youth"); *United States v. Golding*, 05-cr-538, 2022 WL 2985014 at *3 (S.D.N.Y. July 27, 2022) (citing and recognizing the *Ramsay* court's "recent scholarship relating to adolescent brain development"); *United States v. Cruz*, No. 3:94-CR-112, 2021 WL 1326851 at *7 (D. Conn., April 9, 2021) (granting a reduction in sentence by relying upon the brain differences supported by the "scientific evidence" regarding brain development between defendants who are younger than **21** years of age and adult defendants); *United States v. Mazzini*, 487 F.Supp.3d 1170 at 1180 (D. New Mex.) (court reduced sentence where the defendant was **21 years old at time of the offense and 25 years old at the time of sentencing** based upon the "[S]cientific research" which has "revealed the profound ways in which adolescent brain development can compromise decision-making and contribute to criminal behavior") (*citing Graham v. Florida*, 560 U.S. 48, 68-69 (2010)); *United States v. Cheng*, _ F. Supp. 3d _, No. 90-CR-1019-11 (E.D.N.Y. 2023) (reducing sentences to time served for three murders committed when the defendant was **21** and **22** years based upon these same concepts); *United States v. Sims*, No. 3:98-cr-45, 2021 WL 1603959 (E.D. Va. April 23, 2021) (reducing mandatory life sentence to time served for a defendant who was **21** at the time he participated in a bank robbery that resulted in a death, based upon the application of these concepts); *United States v. Espino*, No. 03-20051-08-JWL, 2022 WL 4465096 at *5 (D. Kan., Sept. 26, 2022) (applying same concepts and reducing sentence for defendant who was **20**

years of age when he committed a murder as part of a drug-trafficking conspiracy); *United States v. Birkett*, No. 90-CR-1063-24, 2023 WL 4274683, at *8 (E.D.N.Y. June 29, 2023) (reducing sentences for offenses involving two murders for the defendant who was a youthful offender at the time of the killings).

Moreover, the Seventh Circuit has already acknowledged the relevancy of the concept of adolescent brain development, albeit in a context outside of the sentencing of a defendant. Indeed, in *Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015), the Seventh Circuit reviewed the District Court's grant of summary judgment against an eighteen-year-old applicant for a FOID card. The plaintiff challenged the State of Illinois' requirement that an applicant less than 21 years old needed to obtain the written consent of his parents. In upholding the District Court's summary judgment ruling, the Seventh Circuit in *Thame* relied upon "scholarly research on development through early adulthood," including evidence that "**the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable**." *Id.* at 1133 (emphasis added).[5]

Based upon the above-referenced well-developed and reasoned body of case law, there is a substantial and nationally recognized basis for this Court to take into account the adolescent brain development of Mr. Luckett – i.e., the scientifically well-founded lack thereof: 1) at the time of the offenses that form the basis for his substantially overinflated Criminal History, and 2) at the time of the offense conduct in the present case, as a substantial factor in mitigation. To ignore that strongly developed case law, which is premised upon scientific research, would be contrary to section 3553, and quite frankly contrary to reality.

Finally, the newly amended Sentencing Guidelines, effective November 1, 2024, now recognize that an offender's **age** is an appropriate section 3553 factors that District Courts in

sentencing should now specifically take into account. That amendment:

> **reflects expert testimony** indicating that certain risk factors may contribute to youthful involvement in criminal justice systems, while protective factors, including appropriate interventions, may promote desistance from crime. **Testimony was provided by neuroscientists and psychologists** as well as the executive branch, Federal Public Defenders, advisory groups, criminal justice experts, victims, and formerly incarcerated individuals. **The Commission also received extensive public comment submissions citing recent brain development research studies**.

*See* United States Sentencing Commission, "2024 Amendments in Brief," at

## COST OF CONFINEMENT

There is no purpose to continuing to confine Mr. Luckett at the expense of hundreds of thousands of dollars to the taxpayers, when what he needs is *not* an additional period of confinement - but continued help, assistance, attention to, and treatment of, his mental health issues and substance abuse issues.

Additionally, given Mr. Luckett ' history; the nature of the offense; his conduct and progress while in custody; his strong family ties; and the fact that there is *no evidence* that he continues to pose any on-going danger to the community, it would make absolutely no sense to spend hundreds of thousands of taxpayer dollars to continue to confine him for the unreasonable period of time urged by US Probation and the Government.

## THE KINDS OF SENTENCES AVAILABLE

Justice would clearly *not* be served by incarcerating Mr. Luckett for period of time greater than **ten years**. When considering the nature of his criminal history; his personal characteristics, including a deep and significant history of trauma arising out of the death of his father; his lack of a role model; and his family responsibilities for his young son, this Court should impose a total sentence of **ten years** (120 months) with a term of Supervised Release with

such conditions as deemed appropriate by this Court. To incarcerate him for a period greater than a total term of **ten years** would be far "*greater than necessary*" and would not serve any of the legitimate aims of sentencing.

### THIS COURT CAN ADDRESS ANY CONCERNS IT HAS WITH MR. LUCKETT ALLEGEDLY POSING ANY CONTINUING THREAT BY WAY OF A LONGER TERM OF SUPERVISED RELEASE

To the extent that this Court has any lingering concerns about Mr. Luckett engaging in any type of recidivist conduct, this Court can address any such concerns by way of a lengthier term of Supervised Release.

### THIS COURT SHOULD MOVE AWAY FROM THE FAILED POLICY OF LONGER TERMS OF INCARCERATION

The Government and the Guidelines call for an unnecessarily long term of incarceration – one that is far *greater than necessary* to achieve any of the legitimate aims of sentencing. This is nothing more than an appeal to this Court to revert to the failed policies of locking up defendants for long periods of time - backed by the alleged claim that longer terms of incarceration somehow create better results for the system, for the defendant, and for society as a whole. But those policies have now been shown to be failed ones. Locking up and warehousing Mr. Luckett for an incredibly greater time period than necessary, and for a time period that is far greater than necessary to fulfill any of the legitimate aims of sentencing, serves no one's interests. If anything, such a sentence may even increase Mr. Luckett ' likelihood of recidivist conduct.

## VI. TERMS OF SUPERVISED RELEASE

**Discretionary Conditions:** Mr. Luckett objects only to No. 16, and only in part. There is no reason for US Probation to visit Mr. Luckett , or any other defendant, at work. Employment can be verified in other ways, and such visits can lead to adverse consequences for Mr. Luckett , including termination.

Mr. Luckett also objects to No. 24. Submitting to a search of his "person, property, house, residence, vehicle, papers, or office" by a United States Probation Officer would constitute an unreasonable and unnecessary expansion of the Government's search power. Moreover, such searches should be limited to law enforcement.

**Special Conditions:** No objections.

WHEREFORE, Mr. Luckett , by and through his undersigned counsel, respectfully requests that this Court enter an Order imposing a sentence of **ten years** (120 months) with a term of supervised release, and with such other and further conditions as deemed appropriate by this Court, and for such other and further relief as is appropriate.

**Respectfully submitted,**

By: **/s/ Michael I. Leonard**
**Counsel for Mr. Luckett**

**LEONARD TRIAL LAWYERS**
Michael I. Leonard
Matthew A. Chivari
120 North LaSalle St., Suite 2000
Chicago, Illinois 60602
(312)380-6659 (direct)
(312)264-0671 (fax)
mleonard@leonardtriallawyers.com
matthew@leonardtriallawyers.com

## CERTIFICATE OF SERVICE

The undersigned states that, on July 30, 2025, he EFILED by way of this Court's ECF filing system, the above Defendant's Sentencing Memorandum, which was therefore served upon all counsel of record.

By: **/s/ Michael I. Leonard**
**Counsel for Mr. Luckett**